PHYSICIANS INSURANCE COMPANY OF OHIO ET AL., APPELLEES, *v.* SWANSON ET AL., APPELLANTS.

[Cite as Physicians Ins. Co. of Ohio *v.* Swanson (1991), 58 Ohio St. 3d 189.]

(No. 89-1900—Submitted November 20, 1990—Decided April 3, 1991.)

*Buckingham, Doolittle & Burroughs, Jeffrey E. Schobert* and *Mark D. Frasure,* for appellees.

*Scanlon & Gearinger Co., L.P.A., Timothy F. Scanlon* and *Paul F. Meyerhoefer,* for appellants Gary and Rosemary Baker.

ALICE ROBIE RESNICK, J. The issue presented in this case is the application of a provision in a contract of insurance excluding coverage for injuries expected or intended by the insured. We begin our analysis by reviewing the language of the two provisions involved.

The PICO insurance policy issued to appellants contains the following:

"**Part I, Exclusions to Part G and Part H**

"**1. Part G, Personal Liability Coverage and Part H, Medical Payments to Others** does [*sic*] not apply to bodily injury or property damage:

"a) which is expected or intended by the insured[.]"

Appellants' policy with Cincinnati states as follows:

"**PART I—DEFINITIONS**

"* * *

"**1. Personal Injury** means:

"A. bodily harm * * * to others caused by an **accident**;

"* * *

"3. **Accident** means an event or series of unrelated events that unexpectedly, unintentionally and suddenly causes **personal injury** or **property damage** during the policy period.

" * * *

"**PART IV—WHAT IS NOT COVERED—EXCLUSIONS**

"* * *

"8. **We** will not cover **Personal Injury** or **Property Damage** caused intentionally."

## I

While the insurance policy issued by Cincinnati contains language different from that in the PICO policy, both policies are the same in effect: neither policy provides coverage for intentional or expected personal injuries caused by the insured. The difference is that one policy achieves this result by way of an express exclusion for such injuries (PICO), whereas the other policy does so by way of definition and an exclusion (Cincinnati). Since the effect of both policies is the same, we will treat the respective policy provisions in like manner.

Relying heavily on our decision in *Gill, supra,* the court of appeals concluded that both policies excluded coverage for the injury suffered by Todd Baker. When construing these policy provisions, the appellate court read *Gill* as focusing on the intentional nature of the act, rather than the result of the act, *i.e.,* the injury. The court of appeals went on to note that the trial court specifically found that Bill intentionally fired the gun in the direction of Todd and the others at the picnic table. Thus, applying the above standard to the trial court's findings of fact and conclusions of law, the court of appeals held that the exclusions applied because the insured had acted intentionally.

In *Gill,* we held that "the insurer has no duty to defend or indemnify its insured where the insurer demonstrates in good faith in the declaratory judgment action that the act of the insured was intentional and therefore outside the policy coverage." *Id.* at paragraph two of the syllabus. However, the fact pattern in *Gill* is markedly different from that of the present case. The insured in *Gill* had pleaded guilty to aggravated murder with specifications for killing an eleven-year-old girl. While applying a policy exclusion nearly identical to that in the PICO policy to that fact pattern, we stated, "* * * where the conduct which prompted the underlying wrongful death suit is so indisputably outside coverage, we discern no basis for requiring the insurance company to defend or indemnify its insured * * *." *Id.* at 113, 30 OBR at 428-429, 507 N.E. 2d at 1123. After noting that an essential element of aggravated murder is that the perpetrator intend to cause death, the *Gill* court concluded that "Kerri's death was clearly 'expected or intended by the insured' and therefore the policy does not provide coverage for whatever personal liability Gill [the insured] may have." *Id.* at 115, 30 OBR at 430, 507 N.E. 2d at 1124.

Thus, our holding that there was no coverage in *Gill* was premised on the facts that the insured *intended to cause the injury* of another person, and that this intent was conclusively established by the insured's plea of guilty to aggravated murder. Stated otherwise, our decision was based on a finding that the insured intended to cause an injury, *i.e.,* the death of an eleven-year-old girl. While *Gill* used language regarding the intentional act or conduct of the insured, *Gill* actually stands for the proposition that it is the resultant *injury* which must be intended for the exclusion to apply to deny coverage.

## II

Provisions contained in an insurance policy excluding intentional or expected injuries have been the subject of an extensive body of case law. See 12 Couch, Insurance (2 Ed. 1981) 184-193, Section 44A:133; Annotation, Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected By Insured (1984), 31 A.L.R. 4th 957. Our current interpretation of *Gill* is consistent with the majority rule that has emerged from the case law on this issue in other jurisdictions. In *State Farm Mut. Auto. Ins. Co.* v. *Worthington* (C.A. 8, 1968), 405 F. 2d 683, the insured had fatally wounded a young boy who he thought had tried to steal his watermelons. The insured had fired a .22 caliber rifle in an attempt to scare the young man. In holding that an intentional injury exclusion did not preclude coverage, the court stated that "[t]he preponderance of the evidence in this case indicates that while the discharge of the firearm was intentional the fatal wounding * * * was not intentional but accidental." *Id.* at 686. The court went on to note that "[a]lmost all acts are intentional in one sense or another but many unintended results flow from intentional acts." *Id.* at 688.

While interpreting an exclusion for "property damage caused intentionally by or at the direction of the insured," the Supreme Court of Pennsylvania stated that "the vast majority of courts which have considered such a provision have reached the conclusion that before the insurer may disclaim liability, it must be shown that the insured intended by his act to produce the damage which did in fact occur. Annot., 2 A.L.R. 3d 1238 (1965). We subscribe to such a view. There is a very real distinction between intending an act and intending a result and the

policy exclusion addresses itself quite clearly to the latter." *Eisenman* v. *Hornberger* (1970), 438 Pa. 46, 49, 264 A. 2d 673, 674. The court concluded that while the insured intentionally had broken into the home of another to steal liquor, there was no evidence that a fire caused by the insured had been intentional. The insured minor boy had been using matches to see, and had dropped them as they burnt down to the stem. The court held that absent evidence of an intent to cause the resulting damage (in that case a fire), the exclusion was not applicable.

More recently, a federal court of appeals interpreting Florida law has stated that "* * * we believe the standard enunciated by the lower courts of Florida adheres to the majority rule with respect to 'intentional injury' exclusions. Under the majority rule the exclusion applies if the insured intended to do the particular act, and intended to do some harm * * *. * * * On the other hand, an 'intentional injury' exclusion will not apply if the insured intentionally does an act, but has no intent to commit harm, even if the act involves the foreseeable consequences of great harm or even amounts to gross or culpable negligence." *Allstate Ins. Co.* v. *Steinemer* (C.A.11, 1984), 723 F. 2d 873, 875. The court went on to hold that the evidence created a genuine issue of fact as to whether the insured intended harm when he fired a BB gun at his friend.

Likewise, in *Farmers Ins. Group* v. *Sessions* (1980), 100 Idaho 914, 607 P. 2d 422, the court held that for an exclusion for injuries intentionally caused to operate, the insurance company must demonstrate that the insured acted "* * * for the purpose of causing injury in the person or property in which it resulted." *Id.* at 918, 607 P. 2d at 426. In so holding, the court rejected the insurer's argument that the policy

requires nothing more than an intentional act for the exclusion to operate. The court stated as follows:

"* * * Such an interpretation would radically alter the scope of insurance company liability. On an exclusion such as this one, the company would have no liability for the baseball intentionally thrown which accidentally breaks the neighbor's window, the intentional lane change which forces another driver into the ditch, or the intentionally started trash fire which spreads to the adjacent lot. Countless other examples are imaginable, in all of which the insurance company could rely on such an exclusion to avoid liability because the course of conduct of the insured involved intentional acts. * * *" *Id.* at 917, 607 P. 2d at 425.

In *Colonial Penn Ins. Co.* v. *Hart* (1982), 162 Ga. App. 333, 291 S.E. 2d 410, the evidence presented at trial showed that the insured had fired at a vandal in an attempt to frighten him. The court framed the issue as follows: "* * * the issue in the instant case was not whether Mr. Rice intentionally fired the shotgun. This fact is uncontroverted. Rather, '[t]he *only* issue . . . was whether the [bodily injury] was "either expected or intended from the standpoint of [Mr. Rice]" * * *' *Transamerica Ins. Co.* v. *Thrift-Mart,* 159 Ga. App. 874, 881 (285 S.E. 2d 566) (1981)." (Emphasis *sic.*) *Id.* at 335, 291 S.E. 2d at 412. The court upheld the jury's finding that the injury to the vandal was not intentional, and thus the exclusion was inapplicable.

The Supreme Judicial Court of Massachusetts "* * * consistently has stated that the resulting injury which ensues from the volitional act of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co.* v. *Abernathy* (1984), 393 Mass. 81, 84, 469 N.E. 2d 797, 799.

From the above case law, it can be seen that other jurisdictions require that in order for an exclusion of this nature to apply, an insurer must demonstrate not only that the insured intended the act, but also that he intended to cause harm or injury. The rationale for this rule of law is twofold. First, the plain language of the policy is in terms of an intentional or expected *injury,* not an intentional or expected *act.* Were we to allow the argument that only an intentional act is required, we would in effect be rewriting the policy. Second, as the courts above have noted, many injuries result from intentional acts, although the injuries themselves are wholly unintentional. See *State Farm Mut. Ins. Co.* v. *Worthington, supra,* and *Farmers Ins. Group* v. *Sessions, supra.*

III

In the case at bar, the trial court found that while the insured intentionally fired a BB gun in the direction of the injured person, the injury itself was neither intended nor substantially certain to occur. Rather, the finder of fact conclusively found that the injury was accidental. Based on our interpretation of *Gill, supra,* and the persuasive reasoning of the courts in other jurisdictions, we find the court of appeals erred by requiring that only the act of the insured need be shown to have been intentional.

Therefore, we hold that in order to avoid coverage on the basis of an exclusion for expected or intentional injuries, the insurer must demonstrate that the injury itself was expected or intended. It is not sufficient to show merely that the act was intentional. In this case the exclusion is inapplicable because the trial court's determination

that Todd Baker's injury was not intentionally inflicted or substantially certain to occur is supported by competent, credible evidence.[1] Therefore, the insurers are obligated to defend and indemnify the appellants. The decision of the court of appeals is reversed.

*Judgment reversed.*

SWEENEY, DOUGLAS and H. BROWN, JJ., concur.

MOYER, C.J., HOLMES and WRIGHT, JJ., dissent.

WRIGHT, J., dissenting. I must respectfully but vigorously dissent from today's majority opinion, which holds that an insurer cannot deny coverage to its insured who commits an intentional tort intended or expected to cause injury, yet who merely underestimates the precise extent of harm that results from the tortfeasor's intentional conduct. It is clear to me that this holding misconstrues the plain language of the pertinent insurance policies in this case. It is also clear that this holding flies in the face of long-stated public policy which precludes insuring against intentional torts. See *State Farm Mut. Ins. Co.* v. *Blevins* (1990), 49 Ohio St. 3d 165, 551 N.E. 2d 955; *Harasyn* v. *Normandy Metals, Inc.* (1990), 49 Ohio St. 3d 173, 551 N.E. 2d 962; *Wedge Products, Inc.* v. *Hartford Equity Sales Co.* (1987), 31 Ohio St. 3d 65, 31 OBR 180, 509 N.E. 2d 74; cf. *Preferred Mut. Ins. Co.* v. *Thompson* (1986), 23 Ohio St. 3d 78, 23 OBR 208, 491 N.E. 2d 688. Accordingly, I would affirm the well-reasoned judgment of the court of appeals, which held that the pertinent insurance policies excluded Swanson from coverage, on the implied basis that Swanson could reasonably expect that bodily injury would result from his intentional conduct.

I

In order to properly review the court of appeals' analysis, it is illustrative to first examine several noteworthy facts and circumstances which surrounded Todd Baker's unfortunate injury and which were before the trial court. There was extensive trial testimony to indicate that the tortfeasor, Bill Swanson, had considerable experience in using the gun in question and had a keen awareness of its destructive potential. Swanson admitted on the stand that he had been shooting with his father numerous times and that his father had warned him that the gun was dangerous and could inflict injury. The tortfeasor admitted that he knew the gun could inflict injury and confirmed that he had previously used the gun to kill a squirrel. He also stated that he had used the gun to hit tin cans twenty to thirty feet away.

Additionally, the court heard testimony indicating that Bill Swanson aimed and shot at a group of four teenagers who were in proximity to one another around a picnic table. Shawna Wagler, whom Swanson shot in the thigh immediately prior to shooting Todd Baker in the eye, testified that she was within a foot or two of Todd Baker during the course of these tragic events. Further testimony from Wagler and from Robert Will indicated that Swanson deliberately and directly aimed at this group of young people.

Testimony also revealed that there

---

[1] The court of appeals specifically rejected the insurance companies' argument that the trial court's findings were against the manifest weight of the evidence.

were few, if any, visual obstructions to block or interfere with Swanson's line of sight. Wagler testified that she could clearly see the upper half of the tortfeasor's body as he fired upon the group. Joseph Jogerst, who accompanied Swanson when Swanson fired upon the group, stated that nothing obstructed their view except a little tree. Finally, Joseph Jogerst testified that he heard two screams seconds after shots were fired. It would have been possible for the trial court to conclude from that testimony that the tortfeasor could have heard Shawna Wagler scream before he fired the shot that partially blinded Todd Baker. Thus, Swanson could have heard as well as seen evidence of the physical injuries his assault was inflicting. The trial court obviously disbelieved Swanson's testimony (highlighted by the majority) that he was aiming at a sign ten to fifteen feet away from the victims.

From these facts and circumstances the trial court reasonably found that "* * * William Swanson * * * intentionally shot * * * [and] intentionally fired in the direction of Todd C. Baker and three of his teenage friends * * *."

## II

It was to these facts and circumstances and to this finding of fact that the court of appeals, correctly I believe, applied our holding in *Preferred Risk Ins. Co.* v. *Gill* (1987), 30 Ohio St. 3d 108, 30 OBR 424, 507 N.E.

2d 1118. First, the court of appeals noted that the language of the insurance policy construed in *Gill* and the language of the pertinent policies of this case were strikingly similar. Second, the appellate court noted that in *Gill* we repeatedly referred to the insured's *acts* rather than the results of such acts when we examined the applicability of an insurance policy exclusionary clause in the context of a tortfeasor's intentional behavior. The court of appeals then determined that, based upon *Gill*, it was the intentional nature of Bill Swanson's act, in other words, his conduct, that determined whether coverage would apply, and not the result of the specific damage done to Todd Baker's right eye. Based upon the trial court's finding of fact[2] that Swanson intentionally shot the rifle and intentionally aimed at the closely clustered group of teenagers, the court of appeals concluded that those acts constituted an intentional course of conduct. Therefore, the court properly held that Physicians Insurance Company of Ohio and Cincinnati Insurance Company could deny Swanson coverage under their respective policies. Something is very wrong when this court simply substitutes its view of the facts for that of the traditional fact finder — the trial court.

## III

It is within this context that the majority declares, incredibly, "[w]hile *Gill* used language regarding the in-

---

[2] I must respectfully take exception to the majority's assertion in its footnote one that "[t]he court of appeals specifically rejected the insurance companies' argument that the trial court's findings were against the manifest weight of the evidence." I find this statement to be incomplete and somewhat misleading. It is true that the court of appeals rejected the insurance com-

panies' assignment of error asserting that the trial court's findings were against the manifest weight of the evidence. However, the court of appeals held that the trial court had improperly applied our analysis in *Gill*, *supra*, to the critical factual findings that Swanson intentionally shot the rifle and intentionally aimed at the group of teenagers.

tentional act or conduct of the insured, *Gill* actually stands for the proposition that it is the resultant *injury* which must be intended for the exclusion to apply to deny coverage." (Emphasis *sic*.) I am somewhat surprised at this assertion, since our analysis in *Gill* mentions "conduct" and "act" on more than a dozen separate occasions and *never* states expressly that the specific injury must be intended for the exclusion to apply to deny coverage.

I find it more reasonable to state that *Gill* stands for the proposition clearly enunciated in the opinion that where an insurance policy employs such intentional tort coverage exclusions, the court construing the terms of the policy may infer intent to harm as a matter of law, when the insured could reasonably expect that his or her *conduct* would result in bodily injuries which are a natural and probable result of that conduct. See, also, *Harasyn* v. *Normandy Metals, Inc., supra; Wedge Products, Inc.* v. *Hartford Equity Sales Co., supra; Preferred Mut. Ins. Co.* v. *Thompson, supra.*

It troubles me that the majority implies that only a few states follow such a position. By my count, at least seventeen states follow such a viewpoint. See Annotation, Construction and Application of Provision of Liability Insurance Policy Expressly Excluding Injuries Intended or Expected by Insured (1984 & Supp. 1989), 31 A.L.R. 4th 957. Further, it appears that most of the states surrounding Ohio support the viewpoint noted herein. See *Mid America Fire & Marine Ins. Co.* v. *Smith* (1982), 109 Ill. App. 3d 1121, 441 N.E. 2d 949; *Heshelman* v. *Nationwide Mut. Fire Ins. Co.* (Ind. App. 1980), 412 N.E. 2d 301, 302; *Indiana Lumbermens Mut. Ins. Co.* v. *Brandum* (Ind. App. 1981), 419 N.E. 2d 246, 248; *Willis* v. *Hamilton Mut. Ins. Co.* (Ky. App.

1981), 614 S.W. 2d 251; *Auto-Owners Ins. Co.* v. *Gardipey* (1988), 173 Mich. App. 711, 434 N.W. 2d 220.

Keeping in mind then that the trial court *specifically* found that the tortfeasor, Swanson, intentionally shot his rifle and intentionally aimed at the unfortunate group of teenagers, I will now conduct a brief review of some pertinent holdings and analyses from other jurisdictions construing policy language similar to that in this case.

In *Transamerica Ins. Group* v. *Meere* (Ariz. 1984), 694 P. 2d 181, the Arizona Supreme Court was required to review a policy exclusion for personal injury "which is expected or intended by the insured" in the context of an exchange of physical blows in a fight. The court stated, "* * * if the trier of fact determines that * * * [the insured] was the aggressor and acted wrongfully by striking * * * [the alleged victim] without legal justification, the basic intent to injure will be presumed and the exclusion will apply. * * *" *Id.* at 189. Recently, in reviewing an employer's sexual harassment of an employee, the Arizona Supreme Court opined that "[t]he conduct of * * * [the insured] was so certain to cause injury to * * * [the victim] that his intent to cause harm is inferred as a matter of law, despite his statements to the contrary that all he intended was to provide pleasure and satisfaction. * * *" *Continental Ins. Co.* v. *McDaniel* (1988), 160 Ariz. 183, 185, 772 P. 2d 6, 8.

Federal courts construing California law have also subscribed to this viewpoint. For instance, the United States Court of Appeals for the Ninth Circuit found, in construing California law in a sexual molestation case, that "* * * there is an irrebuttable presumption of an intent to harm in child molestation cases, regardless of whether the defendant was convicted

of a general or specific intent crime. For such conduct to be excluded from insurance coverage, all that must be shown is the intent to commit the acts constituting the molestation. Therefore, the only issue in the instant case is whether there was sufficient evidence that * * * [the tortfeasor] did not form the intent to *act* to withstand a motion for summary judgment." (Emphasis *sic*.) *State Farm Fire Ins. & Cas. Co.* v. *Abraio* (C.A. 9, 1989), 874 F. 2d 619, 623.

When reviewing the intent of a tortfeasor who kicked his victim in the face, an Illinois appellate court implicitly endorsed determinations from other jurisdictions "* * * that a similar policy exclusion applies regardless of whether the tort defendant intended the specific injury as long as that defendant intended to injure the particular victim. * * *" *Mid America Fire, supra,* at 1123, 441 N.E. 2d at 950-951.

Indiana appeals courts have consistently followed the position I advocate herein. The court in *Heshelman* v. *Nationwide Mut. Fire Ins. Co., supra,* at 302, quoting *Home Ins. Co.* v. *Nielsen* (1975), 165 Ind. App. 445, 451, 332 N.E. 2d 240, 244, examined the intent involved when physical blows were exchanged during union picketing and held, " "* * * The latter intent [to cause injury] may be established either by showing an actual intent to injure, or by showing the nature and character of the act to be such that intent to cause harm to the other party must be inferred as a matter of law.' " See, also, *Indiana Lumbermens Mut. Ins. Co.* v. *Brandum, supra,* involving a wrongful death action in which the driver of one car in a fit of jealous rage deliberately rammed a second car containing a driver and the tortfeasor's fiancee. There, the appeals court stated, "* * * It is possible to infer the intent to harm the injured party from the nature of the insured's acts. * * *" *Id.* at 248. See, also, *Willis* v. *Hamilton Mut. Ins. Co., supra* (assault and battery).

An appeals court in Kansas conducted an analysis quite similar to that of the court of appeals in this case in *Cas. Reciprocal Exchange* v. *Thomas* (1982), 7 Kan. App. 2d 718, 647 P. 2d 1361. There, the trial court had found that the tortfeasor pointed a gun at the victim and fired, injuring the victim. The court further found that the tortfeasor did not bump or touch anything to jar his trigger finger prior to the gun's firing. The appellate court declared, "* * * to say that the act of aiming and firing the gun was intentional, but the injury was not, draws too fine a distinction. The better rule is * * * that where an intentional act results in injuries which are a natural and probable result of the act, the injuries are intentional." *Id.* at 721, 647 P. 2d at 1364, citing Prosser, Law of Torts (4 Ed. 1971), Section 8, and Restatement of the Law 2d, Torts (1965), Section 8A, Comment *b*.

In *Auto-Owners Ins. Co.* v. *Gardipey, supra,* a Michigan appellate court, construing an exclusionary provision as applied to assault with intent to commit criminal sexual conduct, held "* * * [t]he intent to injure or harm can be inferred as a matter of law from the alleged sexual penetration * * *." *Id.* at 715, 434 N.W. 2d at 222.

The Minnesota Supreme Court, in *Continental Western Ins. Co.* v. *Toal* (Minn. 1976), 244 N.W. 2d 121, considered the nature of a tortfeasor's intent during the course of an armed robbery. In that oft-cited case, a robber shot and killed a victim and that victim's estate later brought a wrongful death suit against all the participants in the robbery, including one who was

present and armed during the shooting, and another who was the "chief planner" of the crime and who drove the getaway car. Both of these men testified that they did not intend to injure anyone, but that the shooting did not come as a surprise. The court explained "* * * that an injury is 'expected or intended' from the standpoint of the insured if a reason for an insured's act is to inflict bodily injury *or* 'when the character of the act is such that an intention to inflict an injury can be inferred' as a matter of law." (Emphasis *sic*.) *Id.* at 125. The Minnesota Supreme Court reaffirmed this holding in *Fireman's Fund Ins. Co.* v. *Hill* (Minn. 1982), 314 N.W. 2d 834. See, also, *Truck Ins. Exchange* v. *Pickering* (Mo. App. 1982), 642 S.W. 2d 113, 116, citing and approving the holding in *Toal, supra.*

The Nebraska Supreme Court had before it in *State Farm Fire & Cas. Co.* v. *Victor* (1989), 232 Neb. 942, 442 N.W. 2d 880, the shooting death of a person who was alleged to have taken money from purses at a party and at whom the insured fired a shot in retaliation when he saw his silhouette in a doorway. The court reiterated the rule:

" '* * * [A]n injury is "expected or intended" from the standpoint of the insured if a reason for an insured's act is to inflict bodily injury *or if the character of the act is such that an intention to inflict an injury can be inferred as a matter of law.' "* (Emphasis *sic*; citations omitted.) *Id.* at 945, 442 N.W. 2d at 882-883, quoting *Jones* v. *Norval* (1979), 203 Neb. 549, 554, 279 N.W. 2d 388, 391.

The court went on to state:

" 'To hold that under such circumstances the testimony of the insured that he did not intend to injure the plaintiff is sufficient to permit the fact finder to find that no harm to the injured party was intended, simply ignores reality. Any reasonable analysis requires the conclusion that from the very nature of the act harm must have been intended.' " *Id.* at 946, 442 N.E. 2d at 883, quoting *Jones, supra.*

In *Snyder* v. *Nelson* (1977), 278 Ore. 409, 564 P. 2d 681, a man angered by a woman's rejection of his advances rammed into the woman's automobile causing personal injury and property damage. There, the Oregon Supreme Court averred that the trier of fact may infer from the natural and probable results of a tortfeasor's actions that the tortfeasor intentionally injured the victim and damaged her property.

The Vermont Supreme Court reviewed a case in which a sheriff mistakenly sold a mobile home at a sheriff's sale. *State* v. *Glens Falls Ins. Co.* (1979), 137 Vt. 313, 404 A. 2d 101. While holding that the sheriff's conduct was not "intentional" in this case, the court averred "* * * where the circumstances indicate the insured knew his act would damage the injured party he must be taken to have intended it despite subjective testimony to the contrary. * * *" *Id.* at 317, 404 A. 2d at 104.

A Washington appellate court availed itself of the opportunity to determine the applicability of insurance exclusionary language in a case involving non-consensual intercourse in *Western Natl. Assur. Co.* v. *Hecker* (1986), 43 Wash. App. 816, 719 P. 2d 954. It opined that "* * * intent may be actual or may be inferred by the nature of the act and the accompanying reasonable foreseeability of harm * * *." *Id.* at 825, 719 P. 2d at 960.

Finally, a Wisconsin appellate court recently held in a case involving sexual molestation of a minor that certain acts "* * * are so certain to result

in injury to * * * [the victim] that the law will infer an intent to injure on behalf of the actor without regard to his or her claimed intent. * * *" *K.A.G.* v. *Stanford* (1988), 148 Wis. 2d 158, 165, 434 N.W. 2d 790, 793.

## IV

I close by constructing a scenario which I believe might actually be forthcoming under the analysis and holding the majority presents today. Imagine, if you will, an arsonist who "unintentionally" kills a tenant in an apartment building that the arsonist intentionally sets on fire. Thereafter, the estate of the victim brings a wrongful death suit against the arsonist tortfeasor seeking to recover for the tenant's death. Under today's holding, the insurance company, whose policy provides coverage for personal injuries caused by the arsonist, would be responsible for paying the wrongful death claim. For the insurance company to avoid paying the claim, it would have to show that the arsonist specifically intended to kill the victim when he burned the building.

Lest I be accused of taking today's holding to an illogical extreme, I point to the holding of the New Jersey Supreme Court in *Ambassador Ins. Co.* v. *Montes* (1978), 76 N.J. 477, 388 A. 2d 603. That court subscribed to the majority's viewpoint and held that an arsonist's insurer was indeed responsible for paying the wrongful death claim of the arsonist's victim, in a case that duplicates exactly the scenario I posit above. Clearly, to hold insurance companies responsible for paying claims for an insured's homicidal behavior shocks one's conscience, yet such a holding is the logical result of today's holding.

Accordingly, and for the reasons stated above, I would affirm the judgment of the court of appeals and exclude this tortfeasor from the protection of the coverage in question, which by the deliberate and intentional nature of his conduct he does not deserve.

MOYER, C.J., and HOLMES, J., concur in the foregoing dissenting opinion.